Filed Under Seal Pursuant to
31 U.S.C. § 3730(b)(2)



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| The United States of America, ex. rel Jeffrey P. Datto, Ph.D., Bringing this Action on Behalf of the United States of America, <br><br> *Plaintiff,* <br><br> v. <br><br> University of Miami, <br><br> Defendant. | 20-24933-CV-WILLIAMS/MCALILEY <br><br> Civil Action No. _____ <br><br> **Filed Under Seal Pursuant to** <br> **31 U.S.C. § 3730(b)(2)** <br><br> JURY TRIAL DEMANDED |

FILED BY _____ D.C.
DEC 02 2020
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## COMPLAINT

1. Relator Jeffrey P. Datto, Ph.D., brings this action on behalf of the United States of America under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, against Defendant University of Miami ("UM").

## INTRODUCTION

2. "Medical research seeks to improve public health and medical treatment. Because it advances the public good, much of medical research is funded by the United States government. Public research dollars, however, are scarce, and the grant process is highly competitive. Public grants can only be awarded to the most deserving research projects. And once received, public grant funds must be spent responsibly." *United States ex rel. Thomas v. Duke Univ.*, Case No.: 4:13-cv-17 (DE 25, ¶ 2).

3. UM has abused the public trust.

1

Filed Under Seal Pursuant to
31 U.S.C. § 3730(b)(2)

4. Dr. Damien Pearse, a professor at UM, has not been disclosing negative results generated from pre-clinical studies from 2011 to 2019 that intra-spinal injections of Schwann Cells have not been effective in restoring locomotor function, and he has not been fully investigating all safety concerns of the treatment that have been brought to his attention.

5. This research has been supported, in part, by the Spinal Cord Injury Research Program ("SCIRP") Award # W81XWH-10-1-0792, which awarded $1,707,971 to the University of Miami with Dr. Pearse as the principal investigator.

6. As part of this federal grant, through the Department of Defense – Congressionally Directed Medical Research Programs, the results were to be appropriately reported and documented to support a regulatory filing with the FDA.

7. As stated in the public abstract, "Our timeline for moving forward will be to submit the IND upon obtaining positive indications from the three preclinical arms of this investigation." (https://cdmrp.army.mil/search.aspx?LOG_NO=SC090411).

8. As stated in the technical abstract for the grant, "The proposed pre-clinical investigations will provide necessary data to request permission to initiate clinical trials using SCs for acute and chronic SCI." (https://cdmrp.army.mil/search.aspx?LOG_NO=SC090411).

9. However, Dr. Pearse and UM went ahead with the IND submission to the FDA for their approval to initiate clinical studies in patients without the results from all these three preclinical arms being positive.

10. Additionally, Dr. Pearse and UM were to document all the findings using the Laboratory Information Management System ("LIMS"), but once he realized the locomotor recovery findings were not positive, he stopped documenting the findings into LIMS.

Filed Under Seal Pursuant to
31 U.S.C. § 3730(b)(2)

11. Dr. Pearse and UM knew when submitting this grant application that they were going forward with the human clinical trials regardless of "obtaining positive indications from the three preclinical arms of this investigation."

12. This was because of the substantial amount of money that was going to be donated to / raised by UM with the initiation of human clinical trials.

13. Furthermore, none of the human patients have been reported to experience the improved locomotor functioning that was claimed to have occurred previously in the pre-clinical model, while putting these patients at risk who underwent an invasive surgical procedure.

14. The initiation of the clinical studies in patients raised 10's of millions of dollars of donor money for UM and UM.

15. Dr. Pearse and UM are purposely not disclosing negative results from the study.

16. When Relator brought up these concerns of not disclosing negative data to human resource officer, Ms. Marcela Ward, of UM, she told him that it is best to stay quiet because you don't want to lose your job.

17. In addition to not wanting to disclose negative results, Dr. Pearse would also try to manipulate data for the Schwann cell treated groups in order for the results to appear beneficial.

18. If an animal was doing well in a negative control Non-Schwann Cell treated group, he would try to exclude that animal as an "outlier;" however, if an animal was doing well in a Schwann Cell treated group it was included.

19. It is known that there is a varied degree of spontaneous recovery following spinal cord injury; to exclude the subpopulation spontaneously improving for the negative control / not

Filed Under Seal Pursuant to
31 U.S.C. § 3730(b)(2)

treated group and include it in the Schwann cell treated group has likely tainted his past studies, prior to the initiation of the SCIRP award grant.

20. Relator asked Dr. Pearse for the ability to review the raw data from one of his past studies because the reported locomotor improvement was not being seen in the current studies, but Dr. Pearse would not share it with him.

21. Also, Dr. Pearse had Dr. Johana Bastidas, who performed the surgical transplants for these pre-clinical studies, comment on potential issues during the transplant like "bubbles in the injectate," but not automatically exclude such animals and wait to see the end results to determine if excluding them were beneficial or not to sway the results towards the Schwann Cell injections being beneficial.

22. Additionally, the only publication associated with this project on the Department of Defense – Congressionally Directed Medical Research ("CDMRP") website is Relator's publication (https://cdmrp.army.mil/search.aspx?LOG_NO=SC090411): Datto JP, Bastidas JC, Miller NL, Shah AK, Arheart KL, Marcillo AE, Dietrich WD, Pearse DD. Female Rats Demonstrate Improved Locomotor Recovery and Greater Preservation of White and Gray Matter after Traumatic Spinal Cord Injury Compared to Males. J Neurotrauma. 2015 Aug 1;32(15):1146-57. doi: 10.1089/neu.2014.3702. Epub 2015 Apr 13. PMID: 25715192; PMCID: PMC4507304 ( https://cdmrp.army.mil/search.aspx?LOG_NO=SC090411).

23. For that publication, Dr. Pearse told Relator he just wanted to publish the results of the male and female Spinal Cord Injury only animals, and not any that received injections into their spinal cord, to make it "less obvious" that the injection itself caused damage because once publishing this subset of data, he would not be able to use it again in a future publication because he said the same data can't be published twice.

4

Filed Under Seal Pursuant to
31 U.S.C. § 3730(b)(2)

24. However, Relator still went ahead and disclosed some of the negative data from the CDMRP study in his own Veteran Affairs- Career Development Award 2 ("VA CDA-2") grant application.

25. Once Dr. Damien Pearse found out about disclosing the negative data in Relator's own grant application, Dr. Pearse withdrew his support, disqualifying the application, then helped UM set up a scheme to get Relator fired right before he was to start 3 months of paid paternity leave due to the birth of his second daughter, Natalie.

26. Dr. Damien Pearse told the Miami VA that the reason why he decided to pull his support of Relator's grant application was because of the data he included in it, and the Miami VA relayed this to Mr. John C. Spaccarotella, Assistant U.S. Attorney, Southern District of Florida, who was representing the Miami VA and notified Plaintiff this was the reason in an email sent to Relator.

27. However, during a preliminary injunction hearing where Relator represented himself before the Honorable Magistrate Judge Louis in a disability discrimination case, Relator asked Dr. Pearse multiple times why he withdrew his support of Relator's grant application, and each time Dr. Pearse denied that it had anything to do with the data he included in the grant application, while the whole time Relator knew that was the reason because he already had the email from Mr. Spaccarotella in his possession saying Dr. Pearse told officials at the Miami VA that this was the reason.

28. Dr. Pearse lied under oath that day to continue to cover up his attempts to conceal the negative data out of fear of the financial repercussions and legal implications it was going to cause him and UM.

29. Dr. Pearse was not prepared for this line of questioning at the hearing by his legal counsel because they thought Relator was going to be questioning him about disability discrimination.

30. If Dr. Pearse was prepared by his counsel, the answer would have been, in order to continue his deception, that he was concerned about the data and he wanted to perform additional quality assurance to ensure its accuracy before its release, but this is not what he said.

31. Relator also at that hearing showed pictures of safety concerns he had from a pre-clinical study he was involved in of an enlarged spleen and a large abdominal mass (that he was provided to the Department of Justice with his other evidence), and Dr. Pearse at the hearing still admitted that those safety concerns still hadn't been investigated long after Plaintiff brought them up and was terminated from his position.

32. Additionally, Relator believes Dr. Pearse has submitted grant progress reports for this grant through the University of Miami that has not disclosed this negative data.

33. Although Dr. Pearse has kept what was included in progress reports extremely secretive from Relator and Dr. Pearse's other staff, Dr. Pearse's recent scientific publications make no mention of any concern from the pre-clinical studies conducted between 2011-2019 that showed Schwann Cell transplants weren't supporting the previous beneficial locomotor effects.

34. Also, the fact Dr. Pearse was not truthful about the reason he disqualified Relator's grant application, while under oath, supports the high probability that he has not been truthful either in progress reports, while not under oath.

35. Additionally, both Dr. Mousumi Ghosh and Dr. Alexander Marcillo, who have been at UM much longer than Relator, told Relator they don't believe Schwan Cell transplants by themselves have ever had any beneficial locomotor effect in the pre-clinical model.

**Filed Under Seal Pursuant to
31 U.S.C. § 3730(b)(2)**

36. Additionally, from his past data, Dr. Pearse would show as a representation of the benefit of Schwann Cells a video of a rat who experienced spinal cord injury given a Schwann cell implant being able to hold on to a bar, suspending its own body weight, much longer than a rat who did not receive Schwann cell transplantation; that degree of marked improvement was not representative of anything witnessed by Relator and the entire staff who worked under Dr. Pearse from 2011 to 2019; there is no doubt in Relator's mind that the alleged marked improvement, as seen in that video used to promote Schwann cells' benefit, was fabricated.

## JURISDICTION AND VENUE

37. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732 and 3730(b).

38. This Court has personal jurisdiction of the Defendant under 31 U.S.C. § 3732(a) because UM is located in and transacts business in the Southern District of Florida. UM solicited and enrolled students from the District, advertised in the District, and participated in academic activities and athletic activities in the District during all times relevant hereto.

39. Venue is proper in this judicial district under 21 U.S.C. § 3732(a) because, at all times material and relevant hereto, UM transacted business in the Southern District of Florida.

40. Relator's claims are not based on allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the government is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).

41. Relator has filed though a claim with Office of Special Counsel against the Department of Veteran Affairs being investigated by Mr. Jeffrey M. Elkin, Attorney, Investigation and Prosecution Division, U.S. Office of Special Counsel, (202) 804-7039.

42. However, those claims do not involve the University of Miami as a Defendant, do not involve SCIRP Award # W81XWH-10-1-0792, do not involve the disqualification of Relator's VA CDA-2 grant application submission, which occurred in January 2019, nor involve him being terminated from his job at UM, and only involve Dr. Pearse's VA grant, 5 I01 RX001050 through the Miami VA, which is not part of the allegations of these claims.

43. To the extent there has been a public disclosure unknown to Datto, he is the "original source" and meets the requirements of 31 U.S.C. § 3730(e)(4)(b). Datto had direct and independent knowledge upon which the allegations are based, and he has voluntarily provided this information to the government, prior to filing this action under seal, as required by 31 U.S.C. § 3730(b)(2).

## CAUSES OF ACTION
### Count I: False or Fraudulent Claims in Grant Application and Grant Progress Reports. 31 U.S.C. § 3729(a)(1)(A)

44. Relator incorporates paragraph 1-43 as if fully set forth in Count I.

45. The United States seeks relief against Defendant under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

46. UM through Dr. Pearse knowingly caused to present false or fraudulent claims for the SCIRP award grant payment in its application and likely progress reports submitted with respect to this grant.

47. These claims were false or fraudulent because they were: (i) based on false, fabricated, and/or fraudulent statements of research results, (ii) based on false statements that positive findings from the studies were necessary and that they would wait to submit an IND to the FDA until obtaining positive indications from the three preclinical arms of this investigation, (iii) based on omitting / failing to report negative results.

48. These false or fraudulent statements were material to the grant-making agencies' decision to fund the grant.

49. As a result of the false or fraudulent claims, the United States sustained direct and substantial monetary damages, at a minimum, in the amount of federal funds paid to UM through SCIRP Award # W81XWH-10-1-0792, which awarded $1,707,971 to the University of Miami as Dr. Pearse as the principal investigator.

50. The false or fraudulent claims proximately caused additional damages, deprived other researchers access to scarce federal funding, and misled other scientists to obtain federal funds for studies that otherwise would not have been pursued.

51. Additionally, failure to disclose this negative data swayed innocent spinal cord injury patients to enroll in invasive clinical studies, who otherwise may have not enrolled in them.

52. By reason of the false or fraudulent claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

**Count II: False Records or Statements in Grant Application and Grant Progress Reports;**
**31 U.S.C. § 3729(a)(1)(B)**

53. Relator incorporates paragraphs 1-43 as if fully set forth in Count II.

54. The United States seeks relief against Defendant under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

55. UM through Dr. Pearse knowingly caused to present false Records or Statements for the SCIRP award grant payment in its application and likely in progress reports submitted with respect to this grant.

56. These false records or statements include: (i) fabricated, and/or fraudulent statements of research results, (ii) false statements that positive findings from the studies were necessary and that they would wait to submit an IND to the FDA until obtaining positive indications from the three preclinical arms of this investigation, (iii) omitting / failing to report negative results.

57. These false records or statements were material to the grant-making agencies' decision to fund the grant.

58. As a result of the false records or statements, the United States sustained direct and substantial monetary damages, at a minimum, in the amount of federal funds paid to UM through SCIRP Award # W81XWH-10-1-0792, which awarded $1,707,971 to the University of Miami as Dr. Pearse as the principal investigator.

59. The false records or statements proximately caused additional damages, deprived other researchers access to scarce federal funds, and misled other scientists to obtain federal funds for studies that otherwise would not have been pursued.

60. Additionally, these false records or statements swayed innocent spinal cord injury patients to enroll in invasive clinical studies, who otherwise may have not enrolled in them.

61. By reason of the false records or statements, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

### Count III: Violation of 31 U.S.C. § 3730(h)

62. Relator incorporates paragraphs 1-43 as if fully set forth in Court III.

63. Relator engaged in protected activity by opposing UM's policy in not disclosing the negative data generated from the pre-clinical studies.

10

64. He opposed it by including the negative data in his own grant proposals.

65. UM terminated Relator, at least in part, because of Dr. Pearse's false claims against Relator in response to this disclosure of the negative data in Relator's grant proposal.

66. Dr. Pearse also disqualified Relator's grant applications, at least in part, because of this disclosure of the negative data.

**Prayer for Relief**

WHEREFORE, Relator, on behalf of the United States, prays that judgment be entered in their favor and against Defendant as follows:

1. That Defendant pay the United States triple the amount of its damages to be determined, plus civil penalties of up to $11,000 for each false claim, statement, or record;

2. That the Relator be awarded all reasonable attorneys' fees and costs, pursuant to 31 U.S.C. §§ 3730(d)(1) and/or (d)(2);

3. That in the event the United States proceeds with this action, the Relator, for bringing this action, be awarded an amount of at least 15 percent but no more than 25 percent of the proceed of any award or the settlement of the claims;

4. That in the event the United States does not proceed with this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall not be less than 25 percent nor more than 30 percent of the proceeds of any award or settlement;

5. That the Relator be awarded the maximum amount allowed pursuant to 31 U.S.C 3730(d);

6. That Relator be awarded reinstatement with the same seniority status, two times the amount of back pay and interest on the back pay, and compensation for emotional distress, loss of dignity and reputation, loss of enjoyment in advancing in his profession as a result of the discrimination as allowed pursuant to 31 U.S.C. § 3730(h)(2);

7. That the Relator be awarded pre-judgment and post-judgment interest; and

8. That the Court award such other and further relief as is just, equitable and proper;

**Relator requests a jury on all issues so triable.**

Date: 12/02/2020

Respectfully Submitted,

Jeffrey P. Datto, Ph.D.
Relator
3352 w 98th pl
Hialeah, FL 33018
(786) 593-1271
JPDatto@gmail.com

**Filed Under Seal Pursuant to**
**31 U.S.C. § 3730(b)(2)**

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of December, a true and correct copy of the foregoing was served by hand delivery to the Clerk's office.

I further certify that on this 2nd day of December, a true and correct copy of the foregoing was served via certified mail on the United Stated Attorney General pursuant to Fed. R Civ. P. 4(i).

Pursuant to 31 U.S.C. § 3730(b)(2), the matter is under seal and therefore, Defendant will not be served with these pleadings.

Respectfully Submitted,

Date: 12/02/2020

Jeffrey P. Datto, Ph.D.
Relator
3352 w 98th pl
Hialeah, FL 33018
(786) 593-1271
JPDatto@gmail.com